UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| DR. ERIC BECK | ) |

## INFORMATION

The United States charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

### THE DEFENDANT AND RELATED INDIVIDUALS AND ENTITIES

1. Individual 1 resided in Huntsville, Alabama. He served as President and CEO of QBR, LLC (QBR), which was a company that provided electro-diagnostic testing.

2. **DR. ERIC BECK** resided in Huntsville, Alabama. **DR. BECK** owned and operated Valley Center for Nerve Studies and Rehabilitation (Valley Center) and billed insurers for electro-diagnostic testing performed by QBR technicians.

3. Doctor 1 worked for Valley Center and interpreted the results of electro-diagnostic testing performed by QBR technicians.

4. Dr. Mark Murphy operated pain clinics in Tennessee and Alabama and was paid kickbacks by Individual 1, though QBR, to refer patients to QBR for

electro-diagnostic testing.

5. Doctor 2 was a physician at a pain clinic in Rainbow City, Alabama. Individual 1 paid Doctor 2's pain clinic, though QBR, to refer patients to QBR for electro-diagnostic testing.

### QBR AND NERVE TESTING

6. QBR was an Alabama limited liability company with its principal place of business in Huntsville, Alabama. It did business under the name Diagnostic Referral Community. QBR was in the business of, among other things, conducting electro-diagnostic testing, including nerve conduction velocity tests (NCV tests) and sensory evoked potential tests (SEP tests).

7. An NCV test, also called a nerve conduction study, measures how fast an electrical impulse moves through a patient's nerve and is used to identify nerve damage. An NCV test is performed by running an electrical impulse through the nerve being tested.

8. An SEP test measures electrical activity in the brain in response to stimulation of sight, sound, or touch.

9. QBR employed technicians to perform NCV and SEP tests on patients referred to QBR by physicians, and QBR provided the testing equipment for those tests. QBR technicians went to the referring physician office to perform testing on patients there. In exchange for referring patients to QBR, QBR paid the referring

physician or the referring physician's practice a fee for each patient referred.

10. QBR sent the NCV and SEP test results to Valley Center, which was operated by **DR. BECK**. The test results were generally interpreted by Doctor 1. After tests were interpreted, a separate billing company, owned by **DR. BECK,** used **DR. BECK's** National Provider Identifier (NPI) number to bill each patient's insurance for the testing. An NPI number is a unique ten-digit number used by healthcare providers to identify themselves. Later, the billing company used Doctor 1's NPI number to bill the patient's insurance for the testing. Regardless of whether **DR. BECK's** or Doctor 1's NPI number was used, Valley Center was then paid by the patient's insurance for the testing.

11. **DR. BECK** and Individual 1 had an agreement whereby Valley Center then paid money it received from insurance to QBR. During a certain period, QBR then paid a portion of the money back to Valley Center.

### BILLING FOR MEDICAL SERVICES

12. Various public and private entities offer health insurance plans to cover medical care, pharmaceuticals, diagnostic tests, and other services provided to individuals covered by those plans, who are often referred to as "beneficiaries" or "members."

13. Blue Cross Blue Shield of Alabama (BCBSAL) is a private health insurance company that provides medical insurance in Alabama and elsewhere.

14. The Medicare program is a federal healthcare benefit program providing benefits to persons over the age of 65 or disabled. Medicare is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services.

15. BCBSAL and Medicare make insurance payments directly to a provider of medical services or goods, rather than to a beneficiary. This payment occurs after the provider submits the claim to the healthcare benefit program for payment, either directly or through a billing company. By enrolling in BCBSAL and Medicare, and then submitting a claim for payment, a healthcare provider is certifying that services or goods being provided to a patient are provided in accordance with the requirements of the insurer.

16. BCBSAL and Medicare will pay a medical provider only for medical services or goods that are medically necessary for the treatment of the patient being provided the services or goods.

17. In addition, BCBSAL and Medicare will not pay for medical services or goods that were provided in violation of the federal Anti-Kickback Statute.

18. BCBSAL and Medicare require providers to collect co-pays, typically a fixed amount, from patients, in part so that the patient is financially motivated to decline medically unnecessary or otherwise fraudulent services or goods.

19. Medicare is a "federal health care programs," as defined in Title 42,

United States Code, Section 1320a-7b(f).  BCBSAL and Medicare are "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

## COUNT ONE
Healthcare Fraud Conspiracy
[18 U.S.C. § 371 (18 U.S.C. § 1347)]

20. Paragraphs 1 through 19 of this Information are realleged and incorporated as though fully set forth herein.

21. From at least in or about December 2012 and continuing through in or about January 2018 within Madison County in the Northern District of Alabama and elsewhere, defendant

## DR. ERIC BECK

did knowingly and willfully conspire, combine, confederate and agree with others known and unknown to the United States Attorney to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, BCBSAL, and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

**Purpose of the Conspiracy**

22. It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, BCBSAL, and others for claims for items and services that were: (i) medically unnecessary, (ii) not eligible for reimbursement, (iii) not provided as represented, and (iv) based on kickbacks and bribes; (b) concealing the submission of false and fraudulent claims to Medicare, BCBSAL, and others and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

**Manner and Means**

23. The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

24. Individual 1 offered and paid providers, including Dr. Murphy and Doctor 2's pain clinic, in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

25. For example, Individual 1 caused QBR to pay providers a flat fee for each patient that provider referred to QBR for testing that was reimbursed by

insurers, including by Federal health care programs. These payments were disguised as hourly payments for the provider's time and the time of the provider's staff, but the provider was actually compensated on a per-patient basis.

26. Individual 1 also offered and paid kickbacks to sales representatives in the form of direct and indirect remuneration in exchange for and for the purpose of causing those sales representatives to induce providers to refer medically unnecessary electro-diagnostic testing to QBR.

27. Dr. Mark Murphy and other providers solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

28. **DR. BECK** billed health care benefit programs, including Medicare, BCBSAL, and others, for medically unnecessary electro-diagnostic testing.

29. Individual 1 caused QBR to pay Dr. Murphy over $1 million in kickbacks. **DR. BECK** caused Federal health care programs to be billed over $8.3 million for electro-diagnostic testing performed on patients referred by Dr. Murphy.

30. Individual 1 caused QBR to pay Doctor 2's pain clinic over $100,000 in kickbacks. **DR. BECK** caused Federal health care programs to be billed over $2.1 million for electro-diagnostic testing performed on patients referred by Doctor 2.

31. Individual 1 and **DR. BECK** failed to collect mandatory patient co-

pays due for electro-diagnostic testing to incentivize patients not to decline the medically unnecessary procedures.

32.   **DR. BECK** improperly hid from insurers who was performing and interpreting the results of the electro-diagnostic testing.

33.   In total, health care benefit programs, including Medicare, BCBSAL, and others, were billed over $28 million for medically unnecessary electro-diagnostic testing performed by QBR on patients referred by providers who had been paid kickbacks by QBR.

## Overt Acts

34.   In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Alabama and elsewhere, at least one of the following overt acts, among others:

35.   On or about December 21, 2012, Individual 1 caused QBR to pay an $18,000 kickback to Dr. Murphy.

36.   On or about July 11, 2016, **DR. BECK** billed Medicare over $2,000 for medically unnecessary electro-diagnostic testing performed by QBR on a patient referred by Dr. Murphy.

37.   On or about July 18, 2016, Individual 1 caused QBR to pay a $7,000 kickback to Dr. Murphy.

38. On or about November 16, 2016, **DR. BECK** billed Medicare over $2,000 for medically unnecessary electro-diagnostic testing performed by QBR on a patient referred by Doctor 2.

39. On or about November 21, 2016, Individual 1 caused QBR to pay a $10,850 kickback to Doctor 2's pain clinic.

40. On November 29, 2016, Individual 1 caused QBR to pay a $32,815 kickback to a company owned by a sales representative for electro-diagnostic testing performed by QBR on a patients referred by providers associated with that sales representative.

41. On or about July 13, 2017, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Dr. Murphy.

42. On or about July 19, 2017, Individual 1 caused QBR to pay a $7,000 kickback to Dr. Murphy.

43. On or about December 27, 2017, Medicare was billed over $1,500 for electro-diagnostic testing performed by QBR on a patient referred by Doctor 2.

44. On or about January 8, 2018, Individual 1 caused QBR to pay a $7,100 kickback to Doctor 2's pain clinic.

All in violation of Title 18, United States Code, Section 371.

## FIRST NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(7)

1. The allegations in COUNT 1 of this Information are hereby re-alleged

and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2. Upon conviction of the offense set forth in COUNT 1 of this Information, the defendant, **DR. ERIC BECK,** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. The property to be forfeited includes, but is not limited to, a forfeiture money judgment in United States currency, representing the amount of proceeds obtained, controlled, and benefited from as a result of the offense alleged.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

PRIM F. ESCALONA
United States Attorney

*/s/Electronic Signature*

_____
JOHN B. WARD
Assistant United States Attorney

*/s/Electronic Signature*

_____
DON B. LONG III
Assistant United States Attorney